Atlanta Biltmore Hotel Corporation v. Commissioner. Bennie T. Hanson v. Commissioner. William H. Chambers and Rena C. Chambers v. Commissioner.
Atlanta Biltmore Hotel Corp. v. Commissioner
Docket Nos. 94434, 94435, 94524.
United States Tax Court
T.C. Memo 1963-255; 1963 Tax Ct. Memo LEXIS 87; 22 T.C.M. (CCH) 1266; T.C.M. (RIA) 63255; September 19, 1963
M. E. Kilpatrick, 1045 Hurt Bldg., Atlanta, Ga., for the petitioners. George W. Calvert, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in these consolidated cases as follows: Addition to tax
Docket
Income
Sec. 6653(b),
Petitioner
No.
Year
Tax
IRC of 1954
Atlanta Biltmore Hotel Corporation
94434
1954
$22,863.70
$11,431.85
1955
34,366.14
17,183.07
1956
15,717.22
18,876.13
Bennie T. Hanson
94435
1954
25,972.73
12,986.37
1955
43,096.51
21,548.25
1956
36,737.07
18,368.54
William H. Chambers and Rena C. Chambers
94524
1954
2,556.91
1955
2,616.15
1956
1,557.69
In addition to the above deficiencies, the respondent, by an amendment to answer in Docket No. 94434, claims increased deficiencies in income tax and additions to the tax under section 6653(b), Internal Revenue Code *89 of 1954, in amounts as follows: Increased Deficiencies
Addition to tax
Income
Sec. 6653(b),
Year
Tax
IRC of 1954
1954
$11,298.42
$5,649.21
1955
10,631.49
5,315.75
1956
19,948.04
4,784.70
The petitioner in Docket No. 94434 claims an overpayment of income tax in each of the years 1954, 1955 and 1956. The year 1959 is involved in Docket No. 94434 because of an operating loss carryback from 1959 to 1956 that was only partially allowed by the respondent in determining the deficiencies for 1956. Respondent disallowed certain salary deductions and cost of operation items of the Atlanta Biltmore Hotel Corporation consisting of the furnishing of an apartment, meals and servants for its president and meals for her daughter and son, giving rise not only to the question of the correctness of the disallowance but also the correctness of his determinations in other dockets that additional income was received because of the payment of personal expenses. There is an issue as to whether the corporation president received additional income by reason of cash withdrawals from the corporation that were repaid before the close of each year. By amendments *90 to pleadings the remaining useful life of the hotel building and its exhibition hall is placed in issue. There is an issue of fraud present with respect to the returns of the corporation and its president for the years 1954, 1955 and 1956 when, it is admitted, the hotel corporation took deductions for shrubbery purchased for its president's property. Findings of Fact Some of the facts were stipulated and they are found accordingly. The Atlanta Biltmore Hotel Corporation is a corporation organized under the laws of the State of Georgia with its office located at 817 West Peachtree Street, N.E., Atlanta, Georgia. During the years 1951 through 1959 the officers and directors of Atlanta Biltmore Hotel Corporation were as follows: Mrs. Bennie T. Hanson,
President and Treas-
urer
D. O. Beusse,
Vice - President and
Secretary
William C. Candler, Jr.,
Executive Vice-Presi-
dent and Assistant
Treasurer
Rena C. Chambers,
Vice - President and
Assistant Secretary
George T. West,
During said years the outstanding common stock of Atlanta Biltmore Hotel Corporation was owned as follows: Callan Court Company
3,656 shares
William C. Candler, Jr.
260 shares
Rena C. Chambers
260 shares
Mrs. Bennie T. Hanson
3,256 shares
Various people
68 shares
Total
7,500 shares
*91 During said years the entire outstanding preferred stock of Atlanta Biltmore Hotel Corporation was owned by Callan Court Company and the common stock of Callan Court Company was owned 50 percent by Mrs. Bennie T. Hanson, 25 percent by William C. Candler, Jr. and 25 percent by Rena C. Chambers. The Atlanta Biltmore Hotel Corporation filed its Federal income tax returns for the years involved in this proceeding with the district director of internal revenue, Atlanta, Georgia. The Federal income tax returns filed by Mrs. Bennie T. Hanson for the years 1954, 1955 and 1956 were filed with the district director of internal revenue, Atlanta, Georgia. The Federal income tax returns filed by William H. Chambers and Rena C. Chambers for the years 1954, 1955 and 1956 were filed with the district director of internal revenue, Atlanta, Georgia. The above returns were all prepared by Beusse, who was not only an officer of the corporation but also an accountant. The Atlanta Biltmore Hotel Corporation was organized in 1921 by Mrs. Hanson's then husband, William Candler. He put his entire fortune, consisting of some six million dollars, into the corporation. Candler was the corporation's first *92 president and he operated the corporation property until his death in 1936. During these years he and his wife and family, including his son William C. Candler, Jr. and daughter, Rena, now Rena Chambers, lived in a house on the northeast side of Atlanta. The Atlanta Biltmore Hotel Corporation was organized to operate the Atlanta Biltmore Hotel and the adjacent apartment house in Atlanta, Georgia. The hotel building and the apartment building were finished and began operating in 1924. In 1951 the corporation constructed an exhibition or convention hall as an addition to the hotel building. The properties of the Atlanta Biltmore Hotel Corporation are situated on four adjoining blocks and cover approximately four acres of land. The hotel building, the apartment building and the exhibition or convention hall are all located in the same block. The apartment building fronts on Fifth Street and the exhibition hall fronts on Sixth Street. The back of the hotel building is on West Peachtree Street, with its front opening into a garden area between the exhibition hall and the apartment house. The main entrance for guests arriving by automobile is located on the garden or court side of the *93 hotel. Parking is no problem at the hotel. There is parking in the block on which the hotel is located and on properties in two adjoining blocks that are owned by the corporation. There is also parking on top of the exhibition hall. There is sufficient area on the property owned by Atlanta Biltmore Hotel Corporation for expansion of the hotel building or related services. The hotel building is a brick masonry and reinforced concrete structure. There are 13 floors, plus a basement and sub-basement. It contains 464 bedrooms, with baths, and approximately 36 meeting rooms. The capacities of these meeting rooms range from 15 to 2,000 people. The meeting room that holds 2,000 people is the exhibition hall and it is the largest meeting hall owned by any hotel, motel, or motor hotel in Atlanta. The West Peachtree Street side or Arcade level of the hotel building contains an airline bus entrance, the Rendezvous Room, the Pompeaian Room, a coffee shop and cafeteria, a pharmacy, a liquor store, a barber shop, a gift shop, a beauty salon, a snack bar, airline ticket offices and the entrance to the Hunt Room that is located in the basement. The lobby level of the hotel building contains the *94 main entrance on the east side of the building, the lobby, offices, the Empire Room, the Georgian Ballroom, cigar and news stand, Crystal Lounge, and entrance to the convention or exhibition hall. The mezzanine level of the hotel building contains the management offices, writing lounge, and a number of meeting rooms. Floors one through nine of the hotel building contain the bedrooms and suites. The tenth floor contains meeting rooms and related facilities. The hotel building is serviced by three passenger elevators and three service elevators. The convention or exhibition hall which, as stated, was completed by the Atlanta Biltmore Hotel Corporation in 1951, is made of reinforced concrete and is so constructed that trucks can drive in and unload their products. It also can be used for automobile shows. It is so constructed that it can be used as one hall or divided up into separate areas. It is used for meetings, exhibits, banquets and large conventions and will accommodate up to 2,000 people. The following schedule shows the gross room receipts and gross receipts of the Atlanta Biltmore Hotel Corporation for the years 1950 through 1959 as taken from the audit reports of the hotel's *95 auditors: Total Gross
Total Gross
Year
Room Receipts
Receipts
1950
$ 920,232.95
$ 1,989.697.02
1951
994,518.11
2,146,932.66
1952
984,305.44
2,246,681.58
1953
1,092,879.48
2,442,023.55
1954
1,116,743.80
2,410,259.29
1955
1,169,125.45
2,412,362.48
1956
$1,291,264.24
$ 2,590,805.63
1957
1,350,804.97
2,773,243.86
1958
1,279,494.88
2,716,776.51
1959
1,222,166.80
2,687,192.16
On its Federal income tax returns for the years 1954, 1955, 1956 and 1959, the Atlanta Biltmore Hotel Corporation claimed a deduction for depreciation on its hotel building based on a remaining useful life of 20 1/2 years, 19 1/2 years, 18 1/2 years, and 15 1/2 years as of January 1, 1954, January 1, 1955, January 1, 1956 and January 1, 1959, respectively. This was based on a useful life of 50 years for the building from the date of its construction in 1924. In the statutory notice of deficiency in Docket No. 94434, the respondent did not make any adjustment to the depreciation claimed on the Federal income tax returns of the hotel corporation for 1954, 1955, 1956 or 1959 for the hotel building. In allowing a net operating loss carry-back of $104,250.95 from *96 1959 in computing the deficiency for 1956 due from the hotel corporation, the respondent in the statutory notice of deficiency did not make any adjustment to the depreciation on the hotel building that was claimed on the tax return of the hotel corporation for 1959. In its petition filed with the Court on September 20, 1961, the hotel corporation did not raise any issue in respect to the depreciation deduction claimed and allowed on its hotel building in the years 1954, 1955, 1956 and 1959. By an amendment to petition filed on April 16, 1963, the hotel corporation raised an issue in respect to the remaining useful life of the hotel building as of January 1, 1956 and January 1, 1959, contending that the remaining useful life of the hotel building was 7 years commencing on January 1, 1956. By amendment to answer filed on April 16, 1963, the respondent affirmatively alleged that the remaining useful life of the hotel building as of January 1, 1954, January 1, 1955, January 1, 1956 and January 1, 1959, was 30 years, 29 years, 28 years and 25 years, respectively. On its Federal income tax returns for 1954, 1955, 1956 and 1959, the hotel corporation claimed depreciation on its convention *97 or exhibition hall based on a 35-year normal useful life. In the statutory notice of deficiency in Docket No. 94434, applicable to the years 1954, 1955 and 1956, the respondent did not make any adjustment to the depreciation claimed on the hotel corporation's Federal income tax returns for these years for its convention or exhibition hall. In allowing a net operating loss carry-back from 1959 in computing the deficiency for 1956, the respondent did not make any adjustment to the depreciation on the Atlanta Biltmore Hotel Corporation's convention or exhibition hall that was claimed on its tax return for 1959. In its petition filed on September 20, 1961, the hotel corporation claimed additional depreciation on the convention or exhibition hall for each of the years 1954, 1955, 1956 and 1959 on the basis of a normal useful life of 23 1/2 years commencing in 1951. By amendment to petition filed on April 16, 1963 the hotel corporation claims additional depreciation on the convention or exhibition hall and the hotel * for each of the years 1956 and 1959 on the basis of a remaining useful life of 7 years commencing January 1, 1956. *98 During the years involved, the hotel corporation had in excess of 400 employees. Mrs. Hanson, its president, performed duties in connection with the over-all operation of the hotel. During said years she was paid a salary of $30,000 a year. The vice-president and general manager of the Atlanta Biltmore Hotel Corporation during the years involved was D. O. Beusse. Beusse has been in the hotel operation business since 1925. He has been working for the Atlanta Biltmore Hotel Corporation for 38 years, having worked under William Candler when he was president. Beusse has been an accountant since the early 1920s. Beusse is in general supervisory control of the Atlanta Biltmore Hotel Corporation and its operation. He is primarily responsible for all employees of the Atlanta Biltmore Hotel Corporation below the officer level. Beusse does not live on the hotel premises, but carries out his duties largely in the daytime. His offices, along with the offices of the other supervisory officers, are located on the mezzanine floor of the hotel building. The operations of the hotel are carried on through various departments with some-one in charge of each department. There were three shifts *99 of personnel, each working eight hours per day. On each shift there was an assistant manager on duty who was in charge of the room rentals and of the business connected with the operation of the rooms. Initially, any problem is taken up with the assistant manager on duty. The hotel also had a purchasing agent and a full fledged sales department with a sales manager in charge and an assistant sales manager. The hotel had an operations manager, a building superintendent, a chief engineer, an engineering and maintenance department, a catering manager with assistants and security officers that worked around the clock to patrol the floors for the safety of the guests. It also had a staff of bellboys, a front office staff, a food staff, consisting of serving and kitchen employees, a laundry staff, and a housekeeping staff. William C. Candler, Jr., lived in Pine Castle, Florida, where he operated a ranch. He had no special training in operating a hotel. He came to Atlanta two, three or four times a year. He had no specific duties to perform at any specific time for the hotel corporation. He did not have an office in the hotel during the years involved in this proceeding. Rena C. Chambers *100 did not maintain an office at the hotel. She had no specific duties to perform at any specific time for the Atlanta Biltmore Hotel Corporation. Her activities were limited to business contacts and social contacts. During the years 1954, 1955, 1956 and 1959 the hotel corporation paid the following amounts as salaries to William C. Candler, Jr. and Rena C. Chambers: William C.
Rena C.
Year
Candler, Jr.
Chambers
1954
$ 9,900.00
$ 9,100
1955
10,225.00
8,500
1956
10,500.00
10,600
1959
12,694.87
12,300
On its Federal income tax returns for each of the years 1954, 1955, 1956 and 1959 Atlanta Biltmore Hotel Corporation deducted the amounts of $8,000 and $3,100 as compensation for services rendered by William C. Candler, Jr. and Rena C. Chambers, respectively. In the statutory notice of deficiency the respondent determined that $3,000 was a reasonable annual compensation for services rendered by William C. Candler, Jr. in each of the years and that $1,500 was a reasonable annual compensation for services rendered by Rena C. Chambers in each of the years. When Mrs. Hanson's first husband, William Candler, died in October 1936, she moved into the apartment *101 building of the hotel corporation and has lived there ever since. The apartment occupied by Mrs. Hanson during the years involved was converted from two former apartments and it included the entire ninth floor of the apartment building. The area that was incorporated into the apartment encompassed square footage which, when rented as one apartment, rented for $550 per month. When rented as two apartments, such area rented for a total of $575 per month, consisting of $300 for one apartment and $275 for the other. The apartment occupied by Mrs. Hanson contained four bedrooms, four baths, two dens, two living rooms, and two kitchens, one of which had been turned into an office for Mrs. Hanson. Her second husband died in 1950 but her sister lived in the apartment with her during the years here involved. During the years 1954, 1955, 1956 and 1959 the hotel corporation paid as wages or salaries a combined total of $3,261.83, $3,261.83, $3,261.83 and $3,240, respectively, for the four years to Missouri Ware and Luther Braswell and deducted the amounts as salaries on its Federal income tax returns for the respective years. Missouri Ware was Mrs. Hanson's maid who had been with her all *102 her life and worked for her in her apartment. Luther Braswell was Mrs. Hanson's chauffeur-butler who also worked for her at the apartment. During the years 1954, 1955, 1956 and 1959 the Atlanta Biltmore Hotel Corporation furnished food to or for the benefit of Mrs. Hanson, Mrs. Hanson's sister, Rena C. Chambers and William C. Candler, Jr. The meals furnished to Mrs. Hanson and her sister were either consumed in the apartment or in the hotel's eating places. Most of the meals were eaten in the apartment. Some food was cooked in Mrs. Hanson's apartment but the food came from the hotel. Mrs. Hanson did not personally consume all of the food furnished by the hotel but some was consumed by members of various clubs meeting in her apartment, by her son and his family when they visited her and by other personal friends on personal visits to Mrs. Hanson. During the years 1954, 1955, 1956 and 1959 various officers of the hotel corporation signed hotel corporation food tickets in total amounts, as follows: Mrs.
Mrs.
Mr.
Hanson
Chambers
Candler
Total
1954
$5,565.98
$4,044.83
$558.24
$10,169.05
1955
$6,027.33
$4,075.58
$216.32
$10,319.23
1956
$6,249.38
$2,271.41
$ 8,520.79
*103 1959 Mrs. Hanson Food
Miscellaneous
Total
$4,997.91
$1,300.18
$6,298.09
For the years 1954, 1955 and 1956 the respondent increased the hotel corporation's taxable income in the amounts of $4,176.42, $4,222.60 and $4,192.23 on the grounds that these amounts represented the cost of food farnished to and/or for the benefit of Mrs. Hanson, William C. Candler, Jr. and Rena C. Chambers, and other personal expenses of Mrs. Hanson. These amounts were 41.07 percent; 40.92 percent and 49.20 percent of the above listed totals for 1954, 1955 and 1956. The parties have agreed that these amounts were deducted by the hotel corporation on its Federal income tax returns as the cost of food furnished these people. For the year 1959 the respondent adjusted the taxable income of the hotel corporation by the amount of $3,956.09 of which $2,655.91 was determined to be the cost of food furnished to and/or for the benefit of Mrs. Hanson and the remaining $1,300.18 as amounts disbursed to her on various cash tickets for her personal expenses. The parties have agreed that the total amount that was deducted by the hotel corporation for such items for 1959 was 52.24 percent of *104 $6,298.09. In other words, the parties have agreed that the figure to be used for 1959 is $3,290.12 in lien of $3,956.09 set forth in the statutory notice of deficiency. During the years 1954, 1955 and 1956 Mrs. Hanson personally contacted Monroe's Landscape & Nursery Company, Atlanta, Georgia, and arranged for it to furnish shrubs and other material and do certain yard work on properties owned by her and her daughter, Rena C. Chambers, and to bill the charges therefor to the Atlanta Biltmore Hotel Corporation. Monroe's Landscape & Nursery Company (hereinafter sometimes referred to as Monroe's) placed identifying symbols, such as "CB" (representing Chambers), "SNI" or "SNY" (representing Sneider, the name of Mrs. Hanson's grand-daughter who apparently occupied the property), on each of the invoices so that Atlanta Biltmore Hotel Corporation would know what the invoices were for. During the years 1954, 1955 and 1956, Monroe's issued approximately 250 invoices to Atlanta Biltmore Hotel Corporation at various dates covering services rendered by it on properties of Mrs. Hanson and Mrs. Chambers. The total of these invoices for 1954, 1955 and 1956 were in the amounts of $1,462.16, $6,746.69 *105 and $7,051.76, respectively. These amounts were charged to the repair account on the books of the hotel corporation and were deducted as repairs on its Federal income tax returns for the respective years. None of the amounts were charged to the personal accounts of Mrs. Hanson or Rena C. Chambers, and none were repaid to the hotel. On receipt of the aforesaid invoices from Monroe's, Mrs. Hanson okayed the payment of the bills by the hotel. She knew that extensive landscape work was being performed on her property and that of her daughter and knew when she okayed the bills from Monroe's that they had been rendered for work and services furnished for those properties. Mrs. Hanson, after okaying the bills, sent them down to Beusse for approval and payment by the hotel. She knew that the invoices were not being charged to her personally. Beusse knew the meaning of the symbols that had been placed on the invoices by Monroe's and knew that they were not for services and supplies rendered to the Atlanta Biltmore Hotel Corporation. Beusse approved the payment of each of the invoices by the Atlanta Biltmore Hotel Corporation and had them charged to the garden account on the corporation's *106 books where all of Monroe's bills for other work done for the corporation were charged. Beusse knew that an incorrect expense deduction would reduce the taxable income of the Atlanta Biltmore Hotel Corporation. During the years 1951 through 1959, Mrs. Hanson withdrew large sums of money from Atlanta Biltmore Hotel Corporation that were carried on its records in an open account. She did not execute any notes or other evidences of indebtednesses to secure the amounts withdrawn. Beusse issued the checks to Mrs. Hanson at her request and did not question her withdrawing money from the corporation without any notes or other evidences of indebtedness. She did not pay any interest on the funds that she withdrew. Shortly before the end of each year Mrs. Hanson would borrow money from a local bank to cover the amount due the hotel corporation, pay the hotel and shortly after the beginning of the next year she would withdraw money from the Atlanta Biltmore Hotel Corporation and repay the bank. The balances in the account reflecting Mrs. Hanson's withdrawals from the Atlanta Biltmore Hotel Corporation at the date immediately before she reimbursed the hotel through bank loans were as follows: *107 September 4, 1951
$ 30,000.00
October 2, 1952
33,000.00
November 1953
93,500.00
September 1954
107,577.25
December 1955
134,800.25
December 1956
163,002.00
December 1957
202,702.78
December 1958
173,214.69
December 1959
82,000.00
The following schedule shows the increase in Mrs. Hanson's withdrawals of cash from the Atlanta Biltmore Hotel Corporation during the years 1954, 1955 and 1956: 1954
Balance
12-1-54
$107,577.25
Balance
12-1-53
93,500.00
Increase
$ 14,077.25
1955
Balance
12-1-55
$134,800.25
Balance
12-1-54
107,577.25
Increase
$ 27,223.00
1956
Balance
12-1-56
$163,002.00
Balance
12-1-55
134,800.25
Increase
$ 28,201.75
On January 1, 1961 the district director of internal revenue, Atlanta, Georgia, paid hotel corporation $34,045.61 representing a refund of 1956 federal income tax in the amount of $32,175.47 and interest thereon in the amount of $1,870.14, as the result of the allowance of a tentative carry-back adjustment from 1959 to 1956. This refund was taken into consideration in determining the deficiency in income tax shown in the statutory notice of deficiency for the year 1956. *108 In his statutory notice of deficiency in Docket No. 94435, respondent determined Mrs. Hanson received $6,900 in each of the years 1954, 1955 and 1956 through the Atlanta Biltmore Hotel Corporation's providing her with an apartment rent free, On brief he concedes the sum should be $6,600 for each year. In his statutory notice of deficiency in Docket No. 94434, respondent determined it cost the Atlanta Biltmore Hotel Corporation $6,250 $6,250, $6,250 and $3,781.89 to maintain and supply an apartment to Mrs. Hanson in the years 1954, 1955, 1956 and 1959, which amounts it is not entitled to deduct as a part of its cost of operations in the respective years. In the statutory notice of deficiency in Docket No. 94435, the respondent increased Mrs. Hanson's income in the years 1954, 1955 and 1956 by the amounts of $5,565.98, $6,027.33 and $6,249.38, respectively, as the value of food furnished to her or for her benefit and payment of her personal expenses by the Atlanta Biltmore Hotel Corporation, In the statutory notice of deficiency in Docket No. 94524, the respondent increased Rena C. Chambers' taxable income in the years 1954, 1955 and 1956 by the amounts of $4,044.83, $4,075.58 *109 and $2,271.41, respectively, consisting of the value of food furnished to her or for her benefit or convenience. The hotel corporation deducted as wages on its Federal income tax returns for 1954, 1955, 1956 and 1959 the amounts that it paid to a maid and a butler-chauffeur that worked in Mrs. Hanson's apartment in these years. Respondent disallowed these deductions in Docket No. 94434 and in Docket No. 94435 determined Mrs. Hanson received additional income in the amount of $3,261.83 in each of the years 1954, 1955 and 1956 through the hotel corporation's payment of the wages of a maid and a butler-chauffeur that worked in her apartment. In his statutory notice in Docket No. 94434 respondent determined a reasonable annual compensation for the services rendered to the Atlanta Biltmore Hotel Corporation by Rena C. Chambers in each of the years 1954, 1955, 1956 and 1959 was not in excess of $1,500 in each year, and a reasonable annual compensation for the services rendered by William C. Candler, Jr. was not over $3,000 a year. In Docket No. 94435, respondent determined Mrs. Hanson received additional income in the years 1954, 1955 and 1956 in the amounts of $14,077.25, $27,223 and *110 $28,201.75, respectively, through the withdrawal of cash from the hotel corporation. Respondent determined the hotel corporation was not entitled to deduct $420 in 1959 representing dues paid to The Surf Club, Miami, Florida. Respondent determined the hotel corporation was not entitled to deduct the amounts of $1,462.16, $6,746.69 and $7,051.76 on its Federal income tax returns for the years 1954, 1955 and 1956, respectively, representing amounts that it paid for shrubbery and other materials furnished for, and yard work performed on, property of Mrs. Hanson and Rena C. Chambers. Respondent determined the hotel corporation and Mrs. Hanson were both liable for the 50 percent addition to the tax for fraud prescribed by section 6653(b), Internal Revenue Code of 1954, in each of the years 1954, 1955 and 1956. There were underpayments of tax in all dockets in the years involved and in Docket Nos. 94434 and 94435 the tax returns for the years 1954, 1955 and 1956 were fraudulent and part of the underpayment of each petitioner-taxpayer for each year was due to fraud within the provisions of section 6653(b), Internal Revenue Code of *111 1954. Opinion The first issue is whether Mrs. Hanson received additional income during the years in issue to the extent of the fair rental value of the apartment furnished to her rent free by the hotel corporation. Since the same statutes are involved, we can discuss the related issues of whether she and Rena received additional income in the amount of the value of meals furnished to them. Section 61(a), Internal Revenue Code of 1954, defines gross income to include "all income from whatever source derived * * *." This statute is broad enough "to tax all gains except those specifically exempted," Commissioner v. Glenshaw Glass Co., 348 U.S. 426. The individual petitioners argue the value of the lodgings and meals is excluded from their gross income under section 119, Internal Revenue Code of 1954. [1]
*112 Mrs. Hanson was the president of the corporation and owned either directly or indirectly the majority of all of its outstanding stock, The corporation furnished her an apartment consisting of four bedrooms, four bathrooms, two living rooms, two dens and two kitchens, one of which was converted into an office room for Mrs. Hanson. Mrs. Hanson was an employee of the corporation. In order to have the value of the lodgings and meals furnished to her excluded from her gross income, she had the burden of showing that the lodging and meals were furnished "for the convenience" of her employer, and additionally with respect to lodging, that she was "required to accept such lodging on the business premises" as a condition of her employment within the language of section 119; section 1.119-1(b), Income Tax Regs.; Mary B. Heyward, 36 T.C. 739, affd. 301 F. 2d 307. The evidence falls far short of satisfying these statutory conditions. The evidence shows no more than the fact that Mrs. Hanson performed some services for the hotel, mostly of an *113 over-all supervisory nature. Her day-to-day work consisted of reviewing the reports from the various departments, such as the auditing, repair and housekeeping departments. She would walk through the hotel "[to] see what was needed and what needed repairing." She said she received a functional report showing the special functions to be held each day and the room the function was to be held in. She said she did the buying for the hotel but that she did not buy the food. However, she testified her primary responsibility was the over-all operation and not the day-to-day routine duties. There is nothing in her testimony or the testimony of any other witness that would warrant the conclusion that living on the premises was required or even necessary to perform the duties of her employment. According to her own testimony those duties appeared to be no more than the duties of a corporation president interested in the over-all operation of the corporation business and receiving and studying the daily reports from department supervisors whose departments carry on the routine matters of the business operation. These were the same kind of services performed by her first husband, Candler, *114 when he was president of the corporation. He was able to carry them on while living in his own home in Atlanta. It is clear that the corporation did not require Mrs. Hanson to live on the premises in order to retain her position as president. The phrase in the statute (section 119(2)) that the lodging on the business premises must be "required * * * as a condition of his employment" means as stated in respondent's Regulation, sec. 1.119-1(b), "required in order for the employee to perform properly the duties of his employment." We hold there is insufficient evidence to show that proper performance of her duties required that she live on the business premises. We hold also the evidence is insufficient to show her living on the business premises served the convenience of her employer. All of the evidence merely showed it served her own convenience to live in the corporation's apartment. Mary B. Heyward, supra.Thus two of the indispensible conditions of section 119 are not met. The fair value of the lodgings furnished Mrs. Hanson is includible in her income.it is stipulated that *115 during the years involved the area Mrs. Hanson occupied during the years in question rented for $550 a month. Thus Mrs. Hanson received additional income in the form of the value of lodging furnished in the sum of $6,600 a year for each of the years involved. Mrs. Hanson and Rena contend the value of food and meals furnished to them during the years in question is also excluded from their gross income under section 119. Here their burden under the statute is to show the meals and food were furnished "for the convenience of the employer". There is no question as to amounts for the figures are stipulated. There is just no evidence at all to show the meals furnished Rena were for the convenience of the hotel corporation. In fact, as will appear later, there is just no evidence as to any regular duties she performed for the hotel so it would be impossible to conclude her eating there served the convenience of the hotel corporation. As stated earlier, there is evidence that Mrs. Hanson performed some duties for the hotel of an over-all supervisory nature. But there is no evidence that indicates it served the convenience of the hotel corporation to supply her with meals at the hotel *116 or food in her apartment. The evidence that there is does not indicate her presence on the business premises was required at mealtimes. It is rather obvious that Mrs. Hanson probably did not consume all of the food furnished to her by the hotel corporation - stipulated to be almost $500 a month. Her testimony was vague on the issue but she mentioned some entertaining of her family and her friends and clubs at the hotel expense. The statute under which she seeks to exclude the value of food furnished applies only to the employee and it does not cover meals furnished to the employee's family and friends. In any event, the record fails to show the convenience of the corporation was served by furnishing food or meals to either of the individual petitioners. They have failed in their burden to show the value of such meals should be excluded from their income during the years in issue. Our holding that Mrs. Hanson received additional income in the form of a rent-free apartment means the hotel corporation is not entitled to deduct as a part of its cost of operations the cost of maintaining and supplying an apartment for her. Such expenses would not be "ordinary and necessary" expenses *117 paid or incurred during a taxable year in carrying on the hotel's trade or business, within the meaning of section 162(a). Louis Greenspon, 23 T.C. 138; affd. on this issue, 229 F. 2d 947. In his notice of deficiency against the hotel corporation respondent determined the cost of maintaining and supplying the apartment was $6,250 in each of the years 1954, 1955 and 1956, and $3,781.89 in the year 1959 and disallowed such sums as expense deductions. The burden was on the hotel corporation to show respondent's disallowance was erroneous. Beusse made a computation of the actual cost to the corporation of the maintenance of this apartment showing said cost to be a little over $2,400 for each of the years 1954, 1955 and 1956, and a little over $2,600 for the year 1959. His computation resulted from figures showing total utility costs, the relationship of square footage area between apartment building and hotel, and consideration of other factors, such as lack of air conditioning units in the apartment, cost of repairs and depreciation, etc. We need not detail his method of computation for he testified it was designed to show "maintenance" only, with nothing *118 allowed for any pro rata portion of overhead such as taxes, insurance or salaries. Respondent's main attack on Beusse's computation is that it lacks the socalled pro rata overhead charges, and if these were added, the result would be higher than he determined. The income tax returns show the hotel corporation's salaries totaled between five and seven hundred thousand dollars a year and property taxes probably averaged around a hundred thousand dollars a year. There were deductions for insurance of eleven to eighteen thousand dollars a year. Beusse admitted some of his figures were "rough" and we can well understand the difficulties of computation. Our task, which is to determine the cost to the hotel corporation of maintaining and supplying the apartment, is not made easier by any explanation of how respondent computed such costs. His agent was on the stand but he was not asked how the cost figures he determined were computed. Our first observation is that his figures for the years in issue seem too close to the admitted rental the hotel charged for such an apartment. Then, too, the variance from $6,250 during 1954, 1955 and 1956, down to $3,781.89 in 1959, is entirely unexplained. *119 There are infirmities in petitioner's computation but we are loath to hold respondent's computation, which does not appear correct to us on its face, should be sustained because of any presumption of correctness. We can assume the rental of $6,600 represents cost plus profit and we can take into account a likelihood of profit greater than suggested by respondent's figures. Doing the best we can on the record presented, we hold the cost to the hotel corporation of supplving and maintaining the apartment for Mrs. Hanson was $5,000 for each of the years 1954, 1955 and 1956. We leave the year 1959 at $3,781.89, which is the figure respondent determined. Respondent also determined Mrs. Hanson received additional income in the sum of $3,261.83, the stipulated amount that was paid by the hotel corporation to her maid and butler-chauffeur as wages. Mrs. Hanson's own testimony makes it abundantly clear that these persons were her own personal servants. The maid was Mrs. Hanson's personal maid who was with her prior to her moving into the apartment. She merely mentioned the butler-chauffeur was available to chauffeur important hotel guests on sight-seeing tours, and the maid would be in *120 the apartment and could answer the telephone when the hotel called. In her petition she alleges the hotel staffed the apartment with a maid and butler-chauffeur in order to enable her to properly perform her duties for the hotel corporation. We have held that her duties would not justify furnishing a rent-free apartment and the rental value thereof was income to her. For the same reasons the furnishing of servants was not justified and the amount of their wages paid by the hotel corporation for all of the years in issue constituted additional income to her. Once it is determined the apartment was Mrs. Hanson's home and corporate expenditures for its operation were not justified, then the amounts paid by the hotel corporation for maintaining its principal shareholder's home, without any intention of repayment, should be added to her income. Louis Greenspon, supra. During the years involved the hotel corporation paid William C. Candler, Jr. amounts ranging from about ten to twelve thousand dollars a year and Rena amounts ranging from about eight to twelve thousand dollars a year. These amounts were paid as salaries but the hotel corporation only deducted $8,000 annual *121 salary for William and $3,100 annual salary for Rena. In his notice of deficiency in Docket No. 94434, respondent determined $3,000 was reasonable annual compensation for William C. Candler, Jr. and $1,500 was reasonable annual compensation for Rena. The hotel corporation contests these determinations and affirmatively alleges it was entitled to deduct amounts above those deducted for salaries for William and Rena. All of the evidence that was presented would indicate respondent's allowance for salaries for William and Rena might well be excessive. Beusse testified that the figures of $8,000 salary for William and $3,100 for Rena were arrived at by an agreement with a former revenue agent "way back in the late '40's, and that was carried on. Any year that we paid them more than that sum I excluded it as a nondeductible item." However, he also testified that for a time in the late forties William had an office at the hotel and was its resident manager. This was before he went to Florida. He did not testify in this case but the record shows that during the years in issue he had no office at the hotel; that he lived in Florida where he operated a ranch and that he only returned to Atlanta *122 three or four times a year. He had no regular duties to perform for the hotel. He received daily reports from the hotel and he kept in touch with his mother by telephone. His chief service for the hotel was described as keeping abreast of its operations so he would be able to take over if anything happened to his mother. The only work that Rena ever did for the hotel was described as promotional work through her Junior League and social activities. She, too, had no specific duties to perform for the hotel and had no office on the hotel premises. She became ill in 1955 and did not work thereafter and did not testify because of her illness. The hotel corporation did not carry its burden of showing respondent's determinations of reasonable salary allowances for William and Rena were erroneous. See J. J. Hart, Inc., 9 T.C. 135, p. 141. Our holding that Mrs. Hanson received additional income in the amount of the wages the hotel corporation paid her maid and butler-chauffeur means these sums were rightly disallowed by respondent in his determination of the hotel corporation's deficiencies for the years involved. And the same result follows from our holding that Mrs. Hanson *123 and Rena received additional income in the amount of the value of the meals and food furnished to them. To this is also to be added respondent's disallowance of the value of the meals furnished to William in 1954 in the sum of $558.24 and in 1955 in the sum of $216.32. There was just no evidence at all that it served the convenience of the hotel to have William eat on the business premises or at the hotel's expense, on his few trips to Atlanta from his home in Florida. The hotel corporation deducted 41.07 percent, 40.92 percent and 49.20 percent of the total charges for meals for Mrs. Hanson, her daughter and son. Respondent's determination put these amounts back into the hotel corporation's income. We hold he was right in so doing with, however, an agreed adjustment with respect to Mrs. Hanson for 1959, when amounts disbursed on food tickets and for personal expenses were mingled. Respondent disallowed as a deduction an item of $420 for dues paid to The Surf Club, Miami, Florida, on the hotel corporation's income tax return for the year 1959. There was no evidence at all with respect to this. The disallowance is sustained. The next issue relates to the withdrawals from the hotel *124 corporation by its president, Mrs. Hanson. Respondent determined these withdrawals in the amounts of $14,077.25 in 1954; $27,223 in 1955 and $28,201.75 in 1956 constituted income to her. It is respondent's position that these withdrawals constituted dividends to her under section 316(a), Internal Revenue Code of 1954, defining a "dividend" as any distribution of property made by a corporation to its shareholders out of its accumulated earnings and profits or out of its earnings and profits for the taxable year. There is no question about the fact in this case that the earnings and profits of the hotel corporation in the years here involved, and the accumulated earnings and surplus from prior years, exceeded the amounts distributed to Mrs. Hanson. The record shows the hotel corporation had never declared a dividend. Mrs. Hanson's only contention is that the amounts distributed to Mrs. Hanson were loans. The issue is one of fact. Whether a withdrawal is a loan or an advancement *125 for permanent use in lieu of dividends depends upon the existence at the time of the advancement of an intent on the part of the shareholder that it should be paid back, and on the part of the corporation to enforce such payment. Earle v. Woodlaw, 245 F. 2d 119; Lengsfield v. Commissioner, 241 F. 2d 508; Clark v. Commissioner, 266 F. 2d 698. In Elliott J. Roschuni, 29 T.C. 1193, affd. per curiam 271 F. 2d 267, we said: Whether withdrawals from a corporation represent loans or taxable distributions depends on all the facts and circumstances surrounding the transactions between the stockholders and the corporation. Harry E. Wiese, 35 B.T.A. 701 (1937), affd. 93 F. 2d 921 (C.A. 8, 1938), certiorari denied 304 U.S. 562 (1938), rehearing denied 304 U.S. 589 (1938); W. T. Wilson, 10 T.C. 251 (1948). When the withdrawers are in substantial control of the corporation, such control invites a special scrutiny of the situation. W. T. Wilson, supra; Ben R. Meyer, 45 B.T.A. 228 (1941). The record in this case discloses a *126 pattern of numerous substantial withdrawals in ever increasing amounts beginning at least with 1951. Each year the balance in Mrs. Hanson's withdrawal account increased over the amount withdrawn the previous year. On September 4, 1951 the balance was $30,000. By December 1957 the balance had increased to $202,702.78. Mrs. Hanson paid no interest and signed no notes. The withdrawals were carried on an open account on the hotel corporation books. Mrs. Hanson owned, directly or indirectly, the majority of the outstanding common and preferred stock of the hotel corporation, with most all of the remainder owned directly or indirectly by her two children. Mrs. Hanson's testimony with respect to the withdrawals is merely an affirmative answer to a leading question as to whether she had from time to time "borrowed" money from the hotel and a statement that a "goodly sum of it" had been paid back. When asked about the practice of borrowing from a bank around December of each year, paying off the hotel corporation and then withdrawing again in January, she said she had "no personal reason" and that this was done by Beusse. When Beusse testified he was asked about this practice of borrowing from *127 the bank and paying off the hotel each year. He answered: "She did not want it to appear and I did not want it to appear on the balance sheet that she was indebted to the hotel corporation. * * * Well, I didn't think it would be a wise thing. Neither did she think it would be a wise thing to have that balance sheet go to the mortgage loan people." The evidence indicates quite clearly that Mrs. Hanson was merely using a cash withdrawal method to secure distributions from the hotel corporation. The year-end payoff plan was meaningless. C. W. Murchison, 32 B.T.A. 32. The advances were really not paid off until 1959, over a year after the revenue agent had started his audit of the hotel. It is somewhat significant that when the hotel advanced her some $57,000 in 1962 she signed interest-bearing notes to cover the new advancements. The general impression one receives from all of Mrs. Hanson's testimony is that she considered the hotel corporation hers, and that its funds were her funds or at least available to her for her use for her personal convenience and that of her family. There is just no evidence that indicates that during the years in question she intended to repay *128 the advancements the hotel corporation was making to her. Elliott J. Roschuni, supra. Petitioners argue that the advancements must be considered loans because if she had died or the hotel corporation had become insolvent the corporation or its creditors could have recovered the loans from Mrs. Hanson or her estate. The fact that a state law could find from the circumstances a legal obligation to repay does not mean this Court must find the existence on the part of Mrs. Hanson of an intent to repay when the advancement was made. Chism's Estate v. Commissioner, F. 2d , affirming a Memorandum Opinion of this Court. We hold for respondent. Mrs. Hanson failed to sustain her burden of showing error in respondent's determination that her withdrawals constituted income during the years involved. In its income tax returns for each of the years 1954, 1955, 1956 and 1959 the hotel corporation claimed a deduction for depreciation on its hotel building based upon a useful life of 50 years from the date of its construction in 1924, and a deduction for depreciation on its exhibition hall, based on a useful life of 35 years from 1951 when it was constructed. In his notice of *129 deficiency respondent made no change in the depreciation so claimed, In its original petition filed September 20, 1961, the hotel corporation did not raise any issue in respect to the depreciation deduction claimed and allowed for the years in issue with respect to its hotel building. * By an amendment to the petition filed at the time of trial on April 16, 1963, the hotel corporation alleged that "by reason of extraordinary obsolescence" the remaining useful life of the hotel and exhibition hall has been shortened to seven years, commencing as of 1956. This pleading specifically alleges "[such] obsolescence was brought about by the construction and operation of motels in central areas of the City of Atlanta, causing the economically useful life of said Atlanta Biltmore Hotel to be thus shortened, and to become completely obsolete at the end of 1962." The prayer of the petition was amended to ask for a determination that the hotel corporation had overpaid its income tax during the years in question. Respondent countered the *130 amendment to the petition by an amendment to his answer filed the same day (April 16, 1963) claiming the hotel corporation was liable for increased deficiencies for the years 1954, 1955 and 1956 based upon a remaining 10 year longer useful life for the hotel and exhibition hall than shown on the returns for said years and also the 1959 return. Each party had the burden to establish the allegations of its amended pleading and in our opinion neither party sustained its burden. No detailed analysis of the evidence each introduced is necessary. The hotel corporation's contention for a shortened useful life for the hotel and exhibition hall is really defeated by most of its own evidence. Its claim is not based on physical obsolescence of the buildings. By its pleading and argument it narrows the claim to a contention that its hotel and exhibition hall will, or did, have a shortened useful life by reason of outside economic factors, namely, the competition of motels located in the central part of the city beginning in 1956. It is true that an estimated useful life previously assumed can be changed, *131 (A)-9 (A)-9 (A)-9 (A)-9 sec. 1.167 (a)-9, Income Tax Regs., but the fact that it was not changed on the income tax returns when the alleged economic factor came into existence, is significant. In M. Pauline Casey, 38 T.C. 357, at p. 384, we said that the position taken on the tax return was "a factor to be considered" and we have said the estimate of useful life on the return "constitutes an admission against interest" when the taxpayer pleads for a different estimate. Leonard Refineries, Inc., 11 T.C. 1000, at p. 1008. The chronology of events in this case shows the claim for shortened useful life comes some seven years after the claimed extraordinary obsolescence commenced on January 1, 1956. In the meantime, while this claimed extraordinary obsolescence was going on, the hotel corporation filed its 1957 return, and its 1959 return and made no claim for extraordinary obsolescence. It filed its petition in this case in September 1961, at a time when, according to its present claim, the extraordinary obsolescence had continued for four years, and raised no issue of extraordinary obsolescence. It was not until two and one-half years later *132 that the hotel corporation, by its amendment, raised the issue of extraordinary obsolescence, and in effect alleged that the useful life of its hotel property had already expired. It is obvious such a belated contention seeks hindsight re-evaluation of the useful life estimate. To the above we need only add that the hotel corporation was operating its business as usual at the time of trial, a year after it contends it had become obsolete. All of the evidence shows conclusively that the officers and operators were planning for many years of continued operation. In 1957, a year after it contends the hotel started to become obsolete, it spent a quarter of a million dollars reworking the tenth floor and installing the latest decorations. And two years later it installed a swimming pool at a cost of $100,000. Mrs. Hanson, in effect, testified she did not consider the hotel building obsolete. It is a first class hotel, well known throughout the south, and all of the evidence indicates the hotel is considered a good convention hotel. Its exhibition hall is the largest in Atlanta. It has much room for expansion. Atlanta is a growing city. Parking is no problem at all for there is parking *133 on the properties adjacent to the hotel, owned by the hotel corporation, and on top of the exhibition hall. We need not review the evidence of the hotel corporation's so-called expert witnesses. One gave his opinion of the fair market value of the hotel in 1955 and 1962. The other was an accountant who testified as to the declining value of hotel property generally. Their evidence was useless on the issue of useful life of the hotel in the face of the mass of evidence which could only indicate there was no contemplation of abandonment. We need not review respondent's evidence designed to show a lengthened useful life for the hotel and convention hall during the years in issue. It is more persuasive than the evidence of the hotel corporation that it should have a shorter useful life. We hold the evidence insufficient to warrant any change in the useful life estimate of the hotel and convention hall, as originally assumed in the income tax returns. Respondent determined the hotel corporation was not entitled to deduct the amounts of $1,462.16, $6,746.69 and $7,051.76 it paid in 1954, 1955 and 1956 for shrubbery and yard work performed on the property of Mrs. Hanson and Rena. Respondent *134 also added said above amounts to Mrs. Hanson's income for said years. She admits these items should have been included in her income during said years. In the hotel company's petition it is alleged these items "represented additional compensation to Mrs. Hanson" and were therefore deductible. No evidence was offered by the hotel corporation to substantiate its claim, unless it be the sweeping conclusions of Mrs. Hanson to the effect that the hotel was her life work and all she had done and her unreimbursed personal expenditures, all for the benefit of the hotel, left the corporation her debtor. The hotel corporation did not sustain its burden of showing it was entitled to the claimed deductions. Respondent determined both the hotel corporation and Mrs. Hanson are liable for the 50 percent addition to the tax for fraud prescribed by section 6653(b), I.R.C. of 1954, for each of the years 1954, 1955 and 1956. The burden was upon respondent to prove fraud in each case by clear and convincing proof. Arlette Coat Co., 14 T.C. 751. However, the facts and circumstances *135 on which respondent chiefly relies to sustain his determinations are the shrubbery and yard work transactions mentioned above, so the fraud issue in each case can be combined for further discussion. Most of the facts with respect to the nursery furnishing shrubbery and yard work for the residence properties and the hotel corporation paying for same are stipulated. There were in all approximately 250 invoices from the nursery covering the shrubbery and services rendered on the property of Mrs. Hanson and Rena that the hotel corporation paid. They were charged to the hotel repair account and deducted by the hotel as its repairs. Mrs. Hanson testified she personally arranged with the nursery for this work on the properties woned by herself and Rena. She also testified she arranged to have the nursery send the bills for this work to the hotel and she knew the bills were not being charged to her personally. Beusse testified he knew the invoices were for materials and work for the residence properties; that the nursery had told him the meaning of the symbols "CB" and "SNI" on the invoices which indicated Chambers and Sneider properties where the work was performed; and that he approved *136 them for payemnt as hotel repair expense. It is true the hotel cooperated with the revenue agent but there was no voluntary disclosure of the nursery items in issue. Indeed, the record shows the discovery of these shrubbery items was really an accident. The hotel also engaged the same nursery for garden work on its property and there was nothing on the nursery invoices (except the symbols that were meaningless to him) to indicate where the work was done. The revenue agent just happened to pull out an invoice for "Jasmine for mail box." When he noticed the hotel had no outside mail box he made a thorough check and learned the significance of the symbols, and complete disclosure followed. Mrs. Hanson is an active, intelligent businesswoman. Beusse is an intelligent businessman, a long-time hotel operator and an accountant. He was an officer of the hotel corporation and he testified he knew that charging an incorrect repair item would reduce the hotel corporation's taxable income. This is not a case of one or two small items. As stated, there were approximately 250 items in the three-year period. We think the evidence firmly establishes that a "part of * * * underpayment * * * of *137 tax * * * is due to fraud, * * *" for the hotel corporation and Mrs. Hanson for each of the years 1954, 1955, and 1956, within the meaning of section 6653(b), I.R.C. of 1954. The statute does not require all of the underpayment be due to fraud with intent to evade taxes. It is sufficient if part of the deficiency results from fraud of the taxpayer. Frank Imburgia, 22 T.C. 1002. The conclusion to be drawn from all of the evidence in this case and especially the evidence with respect to the shrubbery is that Mrs. Hanson personally and Mrs. Hanson and Beusse as hotel officers acted deliberately and wilfully in the making of what amounted to false statements with intent to evade personal and corporation income tax during each of the years 1954, 1955 and 1956. We hold that a part of the underpayment of tax for each of said years was due to fraud within the meaning of section 6653(b), I.R.C. of 1954. Decisions will be entered under Rule 50. Footnotes
*. By official order of the Tax Court dated September 27, 1963 and signed by Judge Mulroney, the words "and the hotel" were added.↩
1. SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER. There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if - (1) in the case of meals, the meals are furnished on the business premises of the employer, or (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment. In determining whether meals or lodging are furnished for the convenience of the employer, the provisions of an employment contract or of a State statute fixing terms of employment shall not be determinative of whether the meals or lodging are intended as compensation.↩
*. The words "with respect to its hotel building" were added by official order of the Tax Court dated September 27, 1963 and signed by Judge Mulroney.↩