ARNE K. GJESTEBY and MARTHA K. GJESTEBY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gjesteby v. Commissioner
Docket No. 25340-85.
United States Tax Court
T.C. Memo 1987-617; 1987 Tax Ct. Memo LEXIS 662; 54 T.C.M. (CCH) 1364; T.C.M. (RIA) 87617; December 21, 1987. Albert C. Barclay, Jr., for the petitioners. Charles W. Maurer, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency in petitioners' 1982 income tax in the amount of $ 15,500 and an addition to tax under section 661, IRC 1954, in the amount of $ 1,550. The primary issue before us is the allowability of deductions *664 taken by petitioners on Schedule F as farm expenses in connection with a cattle breeding investment. The Commissioner challenges the deductions on three grounds: first, that the expenses were not properly deductible but were required to be capitalized, second, that petitioner did not engage in the activity with a profit motive, and third, that petitioner was not at risk under section 465, IRC 1954, in connection with the amount of the price paid by note. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. [1]
*665 Petitioners were husband and wife residing in Cohasset, Massachusetts, when they filed their petition herein. They use the case method of accounting. Petitioner Arne Gjesteby is a native of Oslo, Norway. In 1950, he obtained a law degree from a law school in Oslo. After he came to the United States, he took the required courses for an MBA at New York City University but did not write a thesis and did not obtain his MBA degree. During the year at issue, petitioner has a ship chandler. His ship chandlery, located on Northern Avenue in Boston, Massachusetts, is organized as Klausen-Gestby Company, Inc. In 1982 he earned $ 150,000.16 from operation of the ship chandlery. That activity constitutes petitioner's principal occupation and provides petitioners with their primary source of income. Before his investment at issue here, petitioner had not been involved in the cattle business. The deductions at issue were taken in 1982 in connection with petitioner's investment in a "Breeding Management Program" (the program) organized by Livestock Breeders International, Inc. (LBI). Petitioner first learned of the program from a financial consultant and stock broker, Russell Laubinger *666 (Laubinger). Petitioner knew Laubinger because Laubinger had previously set up a profit sharing plan for petitioner's company, but it does not appear that petitioner had ever previously relied on Laubinger for investment advice. He made an investment in the LBI program after Laubinger called it to his attention. Petitioner professed to be interested in investments relating to farm activities or farm animals because when he was growing up in Norway various members of his family had farms about 50 miles outside of Oslo where they raised cows and pigs. Laubinger received from LBI, as a commission on the sale of the investment to Gjesteby, an amount equal to ten percent of Gjesteby's cash investment in the program. LBI is a New Jersey corporation which was organized in 1976 or 1977. Its offices are located in New Jersey. M. D. Newman is the President and Treasurer of LBI, and apparently, the driving force behind LBI and its Breeding Management Program. He owns 99 percent of the stock of LBI. In addition, he owns 99 percent and 100 percent, respectively, of two corporations integral to LBI's operation of the program, Princeton Management Group, Inc. (PMG or PMG, Inc.), and Old *667 Chisholm trail Genetics, Inc. (OCT Genetics). Since 1979, PMG has owned 100 percent of a ranch in Oklahoma (PMG ranches or the Oklahoma ranch or the ranch) which is used in the Breeding Management Program. Even before PMG owned PMG ranches, since 1968 or 1969, Newman was a consultant to the owners of the Oklahoma ranch. Apart from some minor activity in connection with bull syndications and show bulls, LBI's principal activity is the promotion and sale of the program in which petitioner here invested. Newman's oldest son, James, is a Vice-President of LBI and is in charge of marketing the program. In 1979, when PMG, Inc. took over PMG ranches, James was a stockbroker. At that time, he began selling cattle investments to some of his clients. The program involved here developed over time from those initial sales by James. The structure of the program was framed in response to the request of clients and with the tax advice of Albert Barclay (Barclay), LBI's tax counsel. Beginning in 1982, the program was sold not just by James, but by a number of insurance agents and stock brokers. The structure of the program marketed by LBI is generally as follows. The investor, through *668 LBI, leases a Simmental cow of breeding age for one period during which it is bred and for another period during which it carries and then weans a calf. The calf born during the lease period (sometimes referred to as "the progeny") then belongs to the investor. That investor can then either sell the progeny, or lease it to another for breeding. Income projections prepared by LBI and offered to investors assume either the sale of the progeny after 24 months or the lease of the progeny after 24 months. Gjesteby testified that he invested in the program with the hope of building a herd that would, after 8 or 10 years, provide him with regular income that would supplement his earnings from his ship chandlery. A herd of Simmental cattle, for breeding purposes, can be as small as 4 animals, but on the average numbers from 13 to 15 animals. Animals in such a herd have a productive life of 8 to 10 years. Petitioner's involvement in the program began on December 27, 1982, when he and LBI entered into a "Breeding Management Agreement". At the time the agreement was signed, Laubinger told petitioner that if there should ever be any question as to petitioner's tax treatment of the investment, *669 LBI would cover the expenses of defending the treatment suggested in LBI's promotional materials. In accordance with that representation, LBI has employed its own tax counsel, Albert Barclay, to represent petitioner here. In the agreement, Gjesteby, as the investor or breeder, agreed to pay a "Management Fee" to LBI and LBI agreed "to serve, as breeding manager for the Principal [investor]". As breeding manager for the investor, LBI agreed to undertake the following: The selection of the proper breed of cattle which offers the most opportunity for capital appreciation, income, and principal; selection of a registered, purebred sire with proven background, proven progeny performance and the capability of passing on the desired genetic traits; the procurement and care of the semen, the selection of a registered, purebred breeding facility; the insemination of the leased breeding facility or the transfer of natural or frozen embryos to insure the best and most productive breeding result; the leasing of gestation facilities for any fertilized eggs produced by the breeding facility; the observation and care of the fertilized eggs produced by this breeding venture and the overall *670 management of this breeding venture.
LBI appears to have delegated to PMG ranches its responsibilities under its agreement with Gjesteby. Its only functions, outside of promoting the program, have been to determine which ranch to use to breed an investor's herd, to compile records sent from the ranches, and, up until June or July of 1986, to bill the investors. LBI further agreed, in the Breeding Management Agreement, to "lease the selected breeding facility for a period of one month" as agent for the investor. The term "breeding facility" is merely a euphemism for a cow of breeding age. The agreement provides that "The Principal will lose at least $ 500 if the leased facility is not conceived during the term of the breeding lease". Approximately 15 to 20 percent of the breedings are not successful. If the breeding is not successful, under the agreement, LBI will make another attempt at breeding the animal for a fee of $ 500. If the investor does not wish to go forward with another breeding attempt, the agreement provides that "the lessor of the breeding facility will retain $ 500 and refund the balance of the lease payment in settlement of all claims for breach of the *671 warranty of fertility contained in the lease of the breeding facility". At trial, Newman testified that the lessor referred to in LBI's contract with the investor is the entity from which LBI, as the agent of the investor, leases the cow. That entity, in petitioner's transaction, was PMG ranches. If the breeding is successful, LBI will then "lease the selected facility [i.e., the cow] for the gestation period". Although the "gestation period" would seem to mean the 285-day period up to the birth of the calf, the investor apparently had the use of the leased cow for the additional 205 days thereafter during which the progeny was weaned. The agreement provides that the investor "bears the risk of loss in this breeding venture, including risk of loss due to failure of dam to conceive". Even with a successful breeding, the investor would still bear the risk of loss due to "disease or death of dam, abortion, miscarriage, stillbirth or deformity, disease, or death of calves". Thus, in its agreement with petitioner LBI did not guarantee the results of a breeding. In the event that the breeding was successful and a calf was born, but it was a bull calf, LBI offered the investor *672 the option of exchanging the bull calf for a heifer calf. Since the number of bull calves could be expected to be approximately equal to the number of heifer calves and since one bull could service a number of cows, a bull calf was generally considered less desirable and less valuable than a heifer calf. LBI would exchange an investor's bull calf for a heifer calf of approximately the same age on payment by the investor of $ 100 consideration. The bull calf would then be sold as commercial beef for $ 300 to $ 400. In petitioner's Breeding Management Agreement, LBI as his agent, agreed to secure the lease of four cows for him. [2] He paid a total of $ 31,000 under the agreement which was broken down as follows: $ 3,000 ($ 750 per animal) for the "Management Fee", $ 25,000 ($ 6,250 per animal) for the "Lease of Breeding Facilities", and $ 3,000 ($ 750 per animal) for the "Lease of Gestation Facilities". [3] Half of the $ 31,000 price was paid in cash at the signing of the agreement. The other $ 15,500 was paid in the form of a promissory note executed that same day. The note provided for 12 percent simple interest payable annually "with principle [sic] at the end of the third year *673 and proceeds to be derived from the sale of progeny". The note was secured by the following collateral: Debtor's present and future interest in the breeding program now managed by Secured Party including, but not limited to, advance payments, breeding facilities, calves, embryos, and other products of conception, gestation facilities and all other rights and moneys due to Debtor under the breeding program.
In many instances investors in the program have been unwilling to make the payments required under their notes. In these instances, LBI has routinely agreed to cancel the note in exchange for the animals produced through the program and the payment of outstanding maintenance fees and interest. Upon entering into *674 the contract with Gjesteby, LBI had then to secure a lease of the cows required by the contract. LBI could lease the cows for the investor from a number of ranches, only one of which (PMG ranches) had any common ownership with LBI. LBI executed four leases on December 27, 1982, in order to fulfill its obligation under the Breeding Management Agreement to lease four specified cows for petitioner. These leases were all leases from PMG ranches. Although in its Breeding Management Agreement with petitioner, LBI agreed to lease the cows as "agent for the Principal", in its leases with PMG ranches, there was no indication that LBI acted as an agent. Each of the four leases stated that it was made between "PMG Ranches, Inc. * * * as the Lessor" and "Livestock Breeders International of New Jersey, Inc. * * * as the Lessee". Each lease contained a set of 13 "conditions and covenants" which were applicable to PMG and LBI as lessor and lessee. Under those terms LBI, as lessee, paid $ 5,500 for each lease of an animal for use as a breeding facility. The leases required LBI to "at [its] own cost and expense care and maintained the leased facility in good condition". If breeding was successful *675 it could then "rent the premises for an additional period of eight months for the purposes of gestation only upon payment of a rental of $ 750". If attempts at breeding the cow were not successful, "the Lessor [PMG ranches] will pay, and the Lessee [LBI] will accept the sum of $ 5,500 in full settlement of all claims arising out of this lease". [4]
Thus, in a successful breeding, the following amounts would be paid per animal by the investor to LBI and by LBI to PMG for the *676 following services: Paid to
Paid by
LBI
LBI to PMG
Management fee
$   750 $   0     Breeding facility
6,250 5,500   Gestation facility
750 750   Total
$ 7,750
$ 6,250   LBI would net $ 1,500 per animal less maintenance costs during the lease period. [5]
The amounts paid by the investor in the event of an unsuccessful breeding are less clear. It would seem that LBI would, despite an unsuccessful breeding, have earned its management fee, but that neither LBI nor PMG would properly be paid for the lease of the gestation facility. As to the lease of the breeding facility, PMG agrees to return $ 5,500 to LBI, but not agreement makes clear the liability to the investor in this connection. With the successful breeding of the leased cows, the investor would then own calves. All the expenses of producing the calves, from the first attempts at breeding their mothers through the weaning of the calves, will have been covered by the various fees paid under *677 the Breeding Management Agreement. Only after the calf is weaned is the investor billed a daily maintenance fee of $ 2.47. The maintenance fee covers the costs of feed, maintenance, supervision, routine medical care, inoculations, and breeding. In his Breeding Management Agreement with LBI, the investor "agrees not to remove any animals less than twelve months old from the custody of Livestock Breeders until specific arrangements have been made for the care of such animals in writing". When the calf reaches breeding age (i.e., becomes a heifer) the investor can request that the heifer be entered into the "Old Chisholm Trail Genetics, Inc., Progeny Lease-Back Program" (the lease-back program). Under the lease-back program, Old Chisholm Trail Genetics, Inc., (OCT Genetics) rents a cow owned by the investor and then subleases that cow to a third party who will then have title to any claves produced from the lease agreement. OCT Genetics pays $ 3,875 for each 285 day lease of a heifer or cow. From that $ 3,875, OCT Genetics deducts expenses estimated at $ 1,060.10 so that the net lease income paid to the investor per cow is approximately $ 2,814.90. OCT Genetics would then presumably *678 lease the cows placed in the lease-back program to LBI for $ 6,250 per animal and then LBI would lease them to a second investor for $ 7,000 per animal, in accordance with the contracts in the record. It is not guaranteed that the first investor will be able to enter his progeny into the lease-back program. An investor may also "direct the sale of animals in writing". On the sale of an animal "Livestock Breeders will be entitled to a fee not to exceed 10% of the net proceeds from the sale". Before Gjesteby entered into the Breeding Management Agreement with LBI he was given a brochure describing the program, along with projections of income that could be earned from the investment. Petitioner sought no additional information, outside of that given him by LBI and the representations made by Laubinger, in deciding to invest in the program. He did not consult with any experts in the field of cattle breeding, nor did he visit either LBI's office or the Oklahoma ranch in order to examine the operation. At the time of trial, he had still never visited the ranch. Instead of investigating the operation of the ranch and the program, petitioner relied on the representations made to *679 him by Laubinger, who had visited the Oklahoma ranch. Laubinger told petitioner that he was impressed with the operation and that he had sold an investment in the program to his own brother. However, Laubinger was a stockbroker. He did not have experience in the cattle business and was not shown to be qualified to value farm animals. The brochure upon which petitioner relied describes the program as one in which the investor, as an absentee owner, can develop a herd of Simmental cattle and benefit from both the herd's appreciation and its production of income through a yearly crop of calves. Simmental cattle are described as "a new exotic breed which offers the superior characteristics commercial beef producers must have to accomplish their * * * objectives". The early 1980s are represented to be an "opportune time to invest in cattle breeding" because those years are perceived to be at the base of an upward trend in the cattle cycle. The tax advantages of investment in the program are emphasized in the brochure. They are mentioned throughout the brochure as well as listed in a separate section entitled "Tax Advantages". That section provides, in pertinent part, as follows: *680 1. 100% write off of total investment in the first year. (May be increased to 200% through use of recourse notes.) 2. No waiting 5 to 7 years to retrieve investment dollars through annual depreciation deductions. 3. No depreciation recapture to reduce future profits. No depreciation has been taken to recapture. 4. Total costs and expenses deductible from ordinary income. 5. Profits from the same of breeding animals may be treated as capital gains income with 60% of the profit excluded from tax -- a maximum 20% tax rate. 6. You can build your own breeding herd on a tax free basis. 7. Your total investment may be protected through insurance and still retain your "at risk" status. 8. Total flexibility -- an investment program that may be structured to meet your tax preference needs. Cash Basis Accounting. Current expenses such as lease fees, interest, management fees, maintenance costs, etc. are deductible in the year of the payment. Capital Gains Rates. Offspring, and successive offspring of leased animals have a zero basis. When held over 24 months for breeding purposes, they are subject to capital gains tax rates. * * * Cattle Breeding tax shelters *681 provide several ways of shielding earnings from taxes and retaining more usable dollars from your earnings. By utilizing approved sections of the tax laws, you create a sheltered income flow, build asset values, and reduce annual tax liabilities. Two separate projections of income and tax benefits associated with the program appear in the record. These projections were furnished go Gjesteby before he entered into the Breeding Management Agreement with LBI, and there is no indication that such projections are not routinely furnished to other potential investors in the program. The first projection was based on the lease of two animals for two years with the sale of the progeny (two animals) at the end of that two year period. This projection is based upon the immediate sale of the progeny after they have matured to breeding age, but have not in turn been leased by the investor to someone else for breeding purposes. Income from the program on that assumption is projected as follows: Pre Tax
After Tax
Lease fee
$ 15,500.00
$  7,750.00
Maintenance thru 24th mo.
* 889.20
444.60
Insurance thru 24th mo. ** 956.12
478.06
Interest thru 24th mo.
1,860.00
930.00
Expenses
$ 19,205.32
$  9,602.66
Projected revenue
$ 20,000.00
$ 16,000.00
Expenses
19,205.32
9,602.66
Net Profit
$    794.68
$  6,397.34
Annualized net profit
$    397.34
$  3,198.67
Annualized return
2%
33%
*682 The second income projection assumes that the investor will lease two animals through the program and then lease the progency produced by those animals to OCT Genetics once a year for three years. At the end of this five year period period the investor will then sell the progeny, receiving capital gains treatment on the sale. The projection warns that the proceeds from the sale "may vary substantially from that estimated". Based on these assumptions that projection of income provides as follows: Table # 7 Old Chisholm Trail Genetics, Inc.
Five Year Breeding Management Program
Per Unit (2 Animals)
Year 1
Year 2
Year 3
Income
Sale of Progeny
- 0 -  - 0 -  - 0 -  Lease of Progeny
- 0 -  - 0 -  b $ 7,750 Less: Lease Sale Cost
- 0 -  - 0 -  (930)
Total Income
- 0 -  - 0 -  $ 6,820 Expenses
BMA
a $15,500 - 0 -  - 0 -  Interest
930 930 930 Insurance
200 775 775 Maintenance
- 0 -  1,803 400 Fees
- 0 -  - 0 -  20 Total Expenses
$ 16,630 $ 3,508 $ 2,125 Income (Loss) Before Taxes
($ 16,630)
$ 3,508)
$ 4,695 Income Subject to Capital Gain
- 0 -  - 0 -  - 0 -  Less: Capital Gain Adjustments
- 0 -  - 0 -  - 0 -  Adjusted Taxable Income
($ 16,630)
($ 3,508)
$ 4,695 Taxes [Savings]
[$ 8,315]
[$ 1,754 ]
$ 2,348 Total Income and Savings After Taxes
[1] $  8,315 [2] $ 1,754 $ 2,347 *683 Year 4
Year 5
Final
Cumulative
Income
Sale of Progeny
- 0 -  - 0 -  c $ 15,000 $ 15,000 Lease of Progeny
$ 7,750 $ 7,750 - 0 -  23,250 Less: Lease Sale Cost
(930)
(930)
- 0 -  (2,790)
Total Income
$ 6,820 $ 6,820 $ 15,000 $ 35,460 Expenses
BMA
- 0 -  - 0 -  - 0 -  $ 15,500 Interest
- 0 -  - 0 -  - 0 -  2,790 Insurance
775 775 410 3,710 Maintenance
400 400 1,012 4,015 Fees
20 20 - 0 -  60 Total Expenses
$ 1,195 $ 1,195 $ 1,422 $ 26,075 Income (Loss) Before Taxes
$ 5,625 $ 5,625 $ 13,578 $ 9,385 Income Subject to Capital Gain
- 0 -  - 0 -  $ 15,000 $ 15,000 Less: Capital Gain Adjustments
- 0 -  - 0 -  ($  9,000)
($ 9,000)
Adjusted Taxable Income
$ 5,625 $ 5,625 $ 4,578 $ 385 Taxes (Savings)
$ 2,813 $ 2,813 $ 2,289 $ 194 Total Income and Savings After Taxes
$ 2,812 $ 2,812 $ 11,289 [3] $29,329 *684 a. Original $ 15,500 Breeding Management Agreement consists of $ 7,750 initial cash investment and $ 7,750 full resourse note due on third anniversary of Agreement.
b. Client will lease two progeny to OCT Genetics, Inc. at age 18 months. This will occur approximately 24 months after entering B.M.A. Progeny will be leased for one gestation period (285 days) once a year for three years (contract years 3, 4, & 5).
c. Progeny will be sold upon weaning of calf born in contract year 5. Weaning age is 205 days after birth of calf.
NOTE: The proceeds from the sale of the progeny may vary substantially from that estimated. The actual value will be determined by a number of factors and cannot be accurately predicted at this time. Both the brochure and the income projections assume that the investor will be able to deduct the expenses of the program currently and take a capital gain deduction on the sale of the progeny. LBI received a "Tax Opinion on LBI's Current Breeding Program" from its attorney, Barclay, which suggested that those tax consequences would flow from the investment under certain circumstances. According to the opinion, expenses of the program would be currently *685 deductible if the investor is "classified as a 'farmer' for federal income tax purposes" and the expenses of the program are classified as "breeding fees" rather than the purchase price of a calf. Classification as a farmer is said to depend on the investor's bearing the risk of loss from operation of the farm and participating to a significant degree in managing the farm. It is suggested that in order to be classified as a farmer, it is important that the investor "assumes a significant role in the development and management of his own herd". The following steps are recommended in order to meet the degree of participation required: To make a significant contribution to management, a participant must actually become a cattleman, even if on a part-time basis. He must learn the cattle business if he wishes to be successful. In addition to choosing experienced advisers to assist him, a participant must educate himself by spending some time on the ranch, conferring with his farm manager and breeding advisors by telephone, reading trade journals and perhaps by taking cattle management courses. He may list "Cattleman" as his second occupation on his income tax returns, and will probably *686 have a photo of his herd in his office. In addition, the opinion says that the sale of the progeny will be treated as a capital gain if the investor holds "his calves for breeding purposes so they will be classified as 'trade or business assets' under Section 1231", rather than as assets "held primarily for sale in the ordinary course of business". The opinion advises that "The best way to demonstrate that a calf is held for breeding purposes is to breed the calf and keep any calves produced by the breeding". It goes on to say that the investor is likely to receive capital gains treatment, even if he does sell calves "if he can show that he is making a genuine effort to build his herd and that the sale of the calf was reasonably necessary for the improvement of his herd". Petitioner's investment in the program did not develop as he testified he had planned. He has not built a herd of cattle beyond the progeny of the cows initially leased. Neither the lease income nor the sales price per animal that was projected ever materialized. Moreover, he has received conflicting information from LBI about the state of his cows and their calves. To begin with, although his contract with *687 LBI provided that he had "selected the following breeding facilities": RW 503J, RW 120K, TKL 3Z, and TKL 1B, one of those animals (TKL 3Z) was not leased by LBI for him. Instead, a dam identified as TKL 152H was leased for him. Further, two of the cows leased for him were already pregnant by unknown sires when leased. In late 1983, petitioner began receiving conflicting reports of the results of the breeding of his leased cows. On November 15, 1983, LBI sent petitioner a telegram announcing that the cow identified as RW 120K had born "a 73 pound baby girl * * * on November 13". On November 18, 1983, LBI wrote petitioner that the same cow (RW 120K) was "safe-in-calf" and expected to bear a calf on December 10, 1983. That November 18 letter also listed the expected calving dates for the three other leased cows. By letter dated December 15, 1983, LBI admitted that its November 18 letter was incorrect and that petitioner's calves had already been born. The next year, a December 1984 computer generated report sent to petitioner showed that the calves had been born between early and mid 1984. In addition, the report showed that a bull had been born, instead of the "baby girl" that *688 had been announced in November 1983. Of the four calves that resulted from petitioner's leasings, one was registered by the American Simmental Association (ASA) in the name of Steven Turner, another investor in the LBI program, and two others were registered in LBI's name. No animals are registered with the ASA in petitioner's name. Despite the inaccurate inforrmation that he received from LBI in 1983, petitioner invested in the program again in late 1983. Further, the record shows that it was not until January of 1985 that petitioner complained by telephone to LBI about the conflicting information he received. This occurred only after the 1984 audit of petitioners' 1982 tax return by the Internal Revenue Service and its challenge of the deductions taken in connection with the program involved here. After that audit, petitioner notified LBI by letter dated March 4, 1985, that he wanted clarification of the inconsistent information he had received before he would pay maintenance fees. On August 2, 1985, LBI informed petitioner that it had not and would not breed his animals while he did not pay maintenance fees; yet, on August 9, 1985, a computer report indicated that all his *689 heifers had been bred in April and May 1985. In July 1985 petitioner began asking LBI to buy two of his calves and lease two of his calves. He continued to press LBI to lease animals from him through the end of 1985. During that same time period, he disputed both the amount of maintenance fees being charged him and LBI's charging him for insurance when it maintained that he had none. By the end of December 1985, petitioner and LBI entered into an agreement which settled their differences. In their settlement, petitioner and LBI agreed upon an amount of maintenance and insurance to be paid. LBI agreed to "give [Gjesteby's] calves priority in our 1986 leasing program". Sometime thereafter, LBI paid petitioner $ 15,500 to lease his four calves produced in the 1982 program. These lease payments provided petitioner with sufficient funds that could be used to satisfy his obligation on his note due LBI in connection with the program. When placed in the lease-back program, petitioner's animals were with calf, and the calves they produced became the property of the lessee, LBI. At the time of trial, LBI's lease on the four cows had expired and petitioner was pressing LBI to again *690 lease his cows. As part of his settlement with LBI, petitioner was given one extra year, until December 27, 1986, to pay the principal amount of his note. However, in July of 1986 petitioner received a letter from Asta Group Incorporated which stated that petitioner's note was delinquent and asked for payment on it. At the time of trial, petitioner had apparently not yet paid the principal balance of the note. As was hereinbefore noted, petitioner began expressing concern over LBI's mismanagement of his investment only after he was audited in connection with the investment. In his correspondence with LBI, petitioner made pointed reference to that audit and the impending Tax Court litigation. As evidenced by that correspondence, petitioner's motive, at least in part, for requesting that LBI place his animals in the leaseback program was because "it is * * * important for the case that I take some active steps to manage my investment". Petitioner also testified that he did not build a herd of cattle "because all the tax problems I'm having with these things". LBI stopped selling the program in 1984 when it became "uncertain about the tax aspects of it". In respect of the *691 year at issue, 1982, petitioner deducted the expenses of the program incurred in that year. These expenses amounted to $ 31,000, the total paid in the form of cash and note under the Breeding Management Agreement with LBI. In 1983 petitioner entered into another agreement with LBI which again covered the lease of four cows. Similarly, deductions were taken on the 1983 return in the amount of $ 31,000 as expenses of petitioner's 1983 investment in the program. In addition, he deducted $ 1,860 in interest in connection with the 1982 program. On the 1984 return $ 3,720 interest was deducted, of which half would appear to be related to the 1982 program and half to the 1983 program. Finally, in 1985 petitioner deducted as current expenses of the cattle activity, $ 7,854 which was attributed to "Breeding fees", "Feed purchased", and interest. In none of these years was there reported any income derived from his participation in the program offered by LBI. The full amount of the expenses thus deducted for the years 1982 through 1985 were reported as losses from the activity. All of the foregoing deductions were taken on Schedule F attached to the respective returns, captioned "Farm *692 Income and Expenses", on which petitioner was stated to be the "proprietor" of PMG ranches, Inc. in Wilson, Oklahoma. These losses were used to reduce the following amounts of income reported for the period 1982 through 1985: 1982
1983
1984
1985
Wages, salaries, tips, etc.
150,000 128,205
152,605
189,231 Interest
4,600 8,534
8,533
7,036 Dividends (after exclusion)
6,055 10,082
16,883
11,123 Tax refunds
208 1,152
896
0 Capital gains
4,742 328
68
(3,000)
Partnership income (loss)
(10,180)
0
223
(133)
No evidence in the record indicates that petitioner realized any income through the program in any other year, except as part of a settlement with LBI hereinafter described. OPINION The Commissioner challenges petitioner's deduction of $ 31,000 in farm expenses in 1982 on several grounds. Because we are not convinced that petitioner engaged in the activity with a profit motive, we need address only that basis for the deficiency.
In order to fully deduct, under either section 162, IRC 1954 or section 212 *693 , IRC 1954, the lease and management fee expenses incurred in connection with his investment in the program, petitioner must show that he engaged in the activity with "an actual and honest objective of making a profit". [6]Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). See also Sutton v. Commissioner,84 T.C. 210, 221 (1985), affd. 788 F.2d 695 (11th Cir. 1986). The profit by which he is required to have been motivated is economic profit, apart from tax benefits. Landry v. Commissioner,86 T.C. 1284, 1303 (1986), on appeal (5th Cir., Jan. 12, 1987); Beck v. Commissioner,85 T.C. 557, 570 (1985); Herrick v. Commissioner,85 T.C. 237, 255 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). Indeed, it has been said that this motive of obtaining economic profit must have been petitioner's primary or dominant motive. Simon v. Commissioner,830 F.2d 499 (3d Cir. 1987), 60 AFTR 2d 87-5741, 87-2 USTC Par. 9554, affg. a Memorandum Opinion of this Court; Polakof v. Commissioner,820 F.2d 321 (9th Cir. 1987), 60 AFTR 2d 87-51707, 87-2 USTC par. 9386, *694 affg. a Memorandum Opinion of this Court; Zell v. Commissioner,763 F.2d 1139, 1142 (10th Cir. 1985), affg. a Memorandum Opinion of this Court; Brannen v. Commissioner,722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Lamont v. Commissioner,339 F.2d 377, 380 n. 4 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; Godfrey v. Commissioner,335 F.2d 82, 84 (6th Cir. 1964), affg. a Memorandum Opinion of this Court; Sutton v. Commissioner,84 T.C. at 221; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). See Fox v. Commissioner,82 T.C. 1001, 1019-1021 (1984). *695 The issue whether petitioner engaged in the activity with the requisite profit objective is to be determined on the basis of all the facts and circumstances. [7]Sutton v. Commissioner,84 T.C. at 221; Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Lemmen v. Commissioner,77 T.C. at 1340 (1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); section 1.183-2(b), Income Tax Regs. We may attach greater weight to objective manifestation of petitioner's intent than to his own statement of his intent. Elliott v. Commissioner,84 T.C. at 237; Fuchs v. Commissioner,83 T.C. 79, 93 (1984); Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); section 1.183-2(a), Income Tax Regs.
*696 Of particular significance to us, in evaluating the profit motive of petitioner in 1982, are the steps he took during that year in order to investigate the activity in which he would invest at the end of the year. When questioned at trial, petitioner could point to no actions that he had taken to investigate the investment, aside from discussing it with Laubinger. Petitioner testified that he intended to build a herd of cattle which, over eight or ten years, would be of a size capable of producing regular income for him. However, despite his stated intention to become involved in such a long term relationship with LBI, he did not independently investigate the qualifications and capability of either LBI or the ranches affiliated with LBI. [8] In fact, even at the time of trial, he still was not familiar with the ranch where his cattle were bred and cared for. He did not know who was in charge of the ranch or what their qualifications were to breed cattle. He did not even meet Newman, the head of LBI, until after he entered into the agreement with LBI in 1982. Moreover, he never saw his cows, nor did he have an expert examine them in order to be assured of their quality as breeders. *697 With regard to all of these matters -- the reputation and capability of LBI, the operation of the ranch, and the quality of the cattle -- petitioner relied exclusively on LBI and the stockbroker who sold him the investment and earned a ten percent commission on the sale. We would expect a profit-seeking investor to have independently investigated at least some of these areas, with a view to verifying the factors on which his profit potential would depend. Petitioner made n such investigation. Additionally, there is no evidence that he consulted with anyone about the feasibility of his plan to build a herd over the course of eight or ten years within the LBI program. The record strongly suggests that the promoter of the program did not anticipate that an investor would be interested in pursuing any such plan involving the long term holding of cows. It based its projections of profit on an investor's holding the progeny produced from leased cows for either no significant period or for up to *698 three years. [9] Moreover, the terms of the Breeding Management Agreement contain little in the way of terms governing the relationship of the parties to it after the progeny are weaned. Further, the note signed by petitioner evidences that both LBI and petitioner anticipated that it would be paid "at the end of the third year * * * from the sale of progeny". Thus to the extent petitioner actually had any such long ranging plans, they were quite unlike those which LBI seemed to have for his investment. As a result, no projections of profit based on petitioner's alleged plan were available from LBI. And petitioner has made no showing that he prepared his own projections or consulted with any cattle breeding experts about the profit potential of his plan. Even given that the projections provided petitioner did not anticipate his stated investment plans, we would still expect him to have studied the projections, *699 and to have attempted to substantiate the income figures on which they were based, in order to apply them to his own professed plan and evaluate its prospects for a profit. Surely, the assumptions underlying the prepared projections, if verified, should have influenced his decision whether to pursue his own, more lengthy, investment plan. Yet, petitioner did not present evidence of any such efforts to verify the assumptions on which the projections were based. The projections assumed that each leased cow would produce a calf that could be leased or sold. However, according to the breeding management agreement, the investor bore the risk that a calf would not be produced. Under these circumstances, an investor concerned with making a profit could be expected to inquire into the likelihood that a calf would not be produced; yet, there is no evidence that petitioner, who impressed us as being an astute businessman, made any such inquiry. Further, the projections showed income as derived from both the lease and the sale of the investor's cattle. The projected income from lease of the cattle would presumably come from participation in the OCT Genetics lease-back program. Yet, participation *700 in that program was never assured and petitioner made no effort to determine the price at which he could expect to lease his cattle to other breeders. [10] Further, he did not seek advice as to the likelihood of receiving the projected $ 7,500 to $ 10,000 per animal on the sale of his cattle. [11] He did not contact an expert qualified to value cattle, nor did he inquire of the American Simmental Association with respect to the price of Simmental cattle. Thus, the only information that petitioner had regarding the income to be earned from his investment, was provided to him by the promoters and the seller of the program. Although petitioner characterizes his failure to earn the expected income either through leasing or on the sale of cattle as a result of the cattle's failure to appreciate in value as expected, we are not convinced that the projected income figures were based on values that were realistic even when the estimates were first presented to petitioner, or that he actually believed them to be realistic. No reliable evidence of the price or value of cattle in 1982 or at any other time appears in the record. *701 In essence, petitioner failed to carry out even the minimal amount of investigation required to verify the critical elements on which the income that could be expected to be earned from the program was necessarily dependent. This fact, alone, could well support a finding that petitioner was indifferent to the prospect of reaping a profit from his cattle breeding venture. In addition, the program was in large part promoted as a means of reducing an investor's tax liability. The promotional literature given to petitioner listed, as a "tax advantage" of the investment, a "100% write off of total investment in the first year". Further, the projections shown to petitioner at the time he was considering the investment reflected substantial tax benefits. Given the tax benefits claimed, we would have trouble concluding that petitioner invested in the program with a profit motive rather than a tax reduction motive. Although the projections do not show that petitioner could recover his investment purely through tax benefits, it is not clear that he studied the projections and understood their significance. [12] Even if he had, we would not necessarily be persuaded that economic profit *702 was his primary or even a substantial motive in making the investment. In the projection which most closely resembles petitioner's investment plan, the program's tax benefits are shown in an amount that would return to petitioner 94 per cent of his cash investment, as explained below in the margin.[13] He would thus have to look to economic profit in order to recoup only six percent of his cash investment. Even if he had shown a profit motive as to this small part of his cash investment that was not projected to be returned to him through tax benefits, we would nonetheless not be convinced that economic profit was more dominant a consideration in petitioner's decision to invest in the program than was the prospect of tax benefit. See Fox v. Commissioner,82 T.C. 1001, 1022 (1984). The tax benefits projected were substantial, the promotion of the program was focused largely on the tax benefits that could be obtained, and petitioner took virtually no action that would indicate he was concerned with economic profit. Under these circumstances, we would not be persuaded that economic profit rather than tax benefits was petitioners underlying motive, even if we were convinced *703 that petitioner had made his investment to any substantial degree in reliance upon the projection. *704 Petitioner argues that he did engage in the cattle activity with a project objective and that his actions in 1985 support a finding for him on this issue. However, we do not find petitioner's attempts in 1985 to have his cattle leased and sold, and to resolve other difficulties he had been having with LBI, to be probative of his motives in 1982 in the circumstances of this case. [14] To be sure, a taxpayer's action in later years have been taken into account in appropriate cases as confirming the existence of his motive in an earlier year where the Court was otherwise satisfied with the evidence of record independently relating to the earlier year. See Taube v. Commissioner,88 T.C. 464, 482 (1987). But that is not the situation here. Not only are we far from satisfied on the basis of the pre-1985 evidence that petitioner in fact had the requisite motive in 1982, but petitioner's actions in 1985 are highly suspect as they relate to his motive in 1982. Those actions were plainly precipitated by the IRS 1984 audit of petitioners' 1982 return and the prospect of litigation *705 in this Court. Petitioner had not taken any action prior to the audit either with respect to clarifying the contradictory information previously sent to him or with respect to having his cattle sold or leased. In the circumstances of this case, such evidence of later events has very little, if any, value, in establishing petitioner's motive in 1982. Cf. Tollefsen v. Commissioner,52 T.C. 671, 680 (1969), affd. 431 F.2d 511 (2d Cir. 1970); Braun v. Commissioner,T.C. Memo. 1971-144, 30 T.C.M. 624, 626, 40 P-H Memo T.C. par. 71,144; Atlanta Biltmore Hotel Corp. v. Commissioner,T.C. Memo. 1963-255, 22 T.C.M. 1266, 1277, 32 P-H Memo T.C. par. 63,255, affd. 349 F.2d 677 (5th Cir. 1965). Further, in the correspondence in which he attempted to settle matters with LBI he conspicuously referred to his need, for the purposes of the tax controversy herein, to develop a favorable fact pattern of taking active steps to manage his investment in the program. Petitioner's 1985 actions appear to be nothing more than an attempt to establish a misleading fact pattern in anticipation of this litigation. *706 Petitioner also argues, throughout his reply brief, that the facts before us here are sufficiently similar to those in Lemmen v. Commissioner,77 T.C. 1326 (1981), that the decision in favor of the taxpayer in Lemmen should control the outcome here. Although Lemmen involved a cattle investment, as does the case before us, the finding therein that the taxpayer engaged in the activity with a profit motive was based on all the facts and circumstances revealed by the record there. Many of those facts and circumstances which pointed to the finding of a profit motive in the Lemmen case are not present here. For example, in Lemmen, the taxpayer visited the ranch and reviewed its operation, consulted with other investors about their experience, received information from the American Polled Hereford Association, and made his own conservative projections of the profit potential of the investment, before investing in it. No similar actions were taken by petitioner here. Moreover, in Lemmen, the contract embodying the taxpayer's investment in the program included both a commitment by the program that it would repurchase the cattle at a set price after *707 twelve years, and the execution of a recourse note by the taxpayer. Further, when the investment program went bankrupt, Lemmen took possession of his cattle. In light of these, as well as a number of other circumstances, the Court in Lemmen concluded that the taxpayer therein "purchased the cattle and continued to hold them throughout the years in question with the predominant purpose and objective of deriving a profit". Lemmen v. Commissioner,77 T.C. at 1346. Given the difference in circumstances between the two cases, no such similar conclusion is compelled here. The Commissioner has also determined that petitioner is liable for a ten percent [15] addition to tax under section 6661 as a result of the "substantial understatement of income tax" in the year before us. Section 6661(a), IRC 1954. Under section 6661(b)(1)(A), a substantial understatement exists where the amount of the understatement exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year, or * * * $ 5,000". There is no question *708 here that petitioner's $ 15,500 understatement of his income tax in 1982 constitutes a substantial understatement unless it can be reduced by application of section 6661(b)(2)(B), IRC 1954. As a result, the focus of controversy between the parties is the application of section 6661(b)(2)(B). Section 6661(b)(2)(B) provides for the reduction of an understatement "by that portion of the understatement which is attributable to": (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.
If the item which causes the understatement is "attributable to a tax shelter", reduction of the understatement *709 is governed by section 6661(b)(2)(C), which makes that reduction more difficult. In the case of a tax shelter, adequate disclosure of the facts relevant to the tax treatment will not result in reduction of the understatement. Instead, only if the tax treatment used is supported by "substantial authority" (section 6661(b)(2)(B)(i)) and the taxpayer "reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment" is the understatement reduced, section 6661(b)(2)(C)(i)(II), IRC 1954. Respondent contends that "the transaction in question is a tax shelter within the meaning of section 6661(b)(2)(C)", and that petitioners have not met the standards for reduction of the understatement that apply to tax shelters. We need not decide whether this case involves a tax shelter [16] as defined in section 6661(b)(2)(C)(ii), IRC 1954, because even under the less stringent standards that apply to cases which do not involve tax shelters, we conclude that there was not "substantial authority" for the tax treatment taken by petitioner. [17]
*710 In describing the "substantial authority" required in order to reduce an understatement, the Conference Report accompanying the bill which became The Tax Equity and Fiscal Responsibility Act of 1982, [18] adding section 6661 to the Code, states that: Whether the taxpayer's filing position is or was supported by substantial authority will depend on the circumstances of the particular case. It will be necessary to weigh court opinions, Treasury regulations and official administrative pronouncements (such as revenue rulings and revenue procedures) that involve the same or similar circumstances and are otherwise pertinent, as well as the Congressional intent reflected in the committee reports, to determine whether the position is supported by present law and may be taken with the good faith expectation that it reflects the proper treatment of the item. [Conf. Rept. 97-760 at 575 (1982), 1982-2 C.B. 600, 650]
See also section 1.661-3(b), Income Tax Regs.
The circumstances of this case, as we have found them, are that petitioner did not engage in the cattle breeding activity with a profit motive. *711 The relevant authorities provide no support for petitioner's deductions. Petitioner has not called our attention to any substantial authority for his contested 1982 deductions on the facts of this case. As a result, he cannot avoid full application of the addition to tax imposed by section 6661 for a substantial understatement of tax. Decision will be entered for the respondent.
Footnotes
1. In petitioners' reply brief, filed April 13, 1987, long after the trial of this case and almost two months after the filing of opening briefs, petitioners attached an affidavit and requested the Court to make specific findings of fact based on the affidavit. The reply brief stated that the IRS would be asked to agree to the requested findings (referred to as "stipulations based on the facts set forth in" the affidavit). The Court has been informed by the Government that it objects to the "additional stipulations" and petitioners' request for additional findings of fact based thereon. We are of the opinion that petitioners' request for additional findings comes altogether too late, in the absence of agreement by all the parties, and the affidavit is not properly before us. We make no such findings based thereon. ↩
2. Petitioner invested in the program again in 1983, entering into substantially the same agreement with LBI which covered an additional four cows. ↩
3. The LBI leasing program in 1982 was organized on the basis of a "breeding unit" consisting of two animals. Petitioner's agreement relating in substance to four cows actually involved two breeding units, and the figures above represent merely the fees, etc., applicable to a breeding unit multiplied by two. ↩
4. This term of the contract between LBI and PMG gives LBI a full refund of the $ 5,500 it paid for the lease of the breeding facility. However, LBI's contract with petitioner states that the lessor (PMG) will retain $ 500 of the lease payment. These terms appear to be inconsistent if PMG receives $ 5,500 per animal from LBI for the lease, since in that case it would seem that PMB could not both keep $ 500 and return $ 5,500 to LBI. This inconsistency is corrected in a lease that appears in the record but which was not executed for petitioner here. In that corrected lease, the lease payment required of LBI is $ 500 more than the amount required to be refunded in case of an unsuccessful breeding. ↩
5. As hereinbefore noted, LBI's lease with PMG required LBI to "at [its] own cost and expense care and maintain the leased facility in good condition." ↩
*. Maintenance fee computed on basis of 180 days for 2 animals at 2.47 per day per animal. **Insurance fee computation based on 5% of insured value of $ 7,750 for 2 animals for 451 days. This period begins at birth. ↩
1. This number should be negative. It is the result of combining the $ 16,630 loss with the $ 8,315 tax saving. ↩
2. This number should be negative. It is the result of combining the $ 3,508 loss with the $ 1,754 tax saving. ↩
3. As a result of the above adjustments, this figure should be $ 9,190.↩
6. If petitioner's cattle breeding activity is determined to be one "not engaged in for profit", then petitioner may deduct his expenses incurred in connection with the activity only to the extent that they would otherwise be deductible regardless of his profit motive, and to the extent he derives gross income from the activity in excess of those otherwise deductible expenses. Section 183(b)(1) and ( 2), IRC 1954↩. Here, none of the 1982 expenses deducted were allowable without regard to profit motive and petitioner has derived no gross income from the activity. Thus, characterization of his investment in the program as an activity "not engaged in for profit" will result in disallowance of the full $ 31,000 deducted in 1982. 7. Some of the "factors which should normally be taken into account" are listed in sec. 1.183-2(b)(1)-(9), Income Tax Regs., as follows: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) The financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation.
This Court has previously noted that these factors, which originated in the hobby loss area, can prove difficult to apply to shelter activity. Estate of Baron v. Commissioner,83 T.C. 542, 554 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986). For example, factor 9, the "elements of personal pleasure" provided by the activity is not generally determinative of whether the taxpayer's motive is economic gain as opposed to tax benefits. As a result, we do not dissect the record with respect to each such factor in this case, but consider only those pertinent in the circumstances presented. 8. Thus, petitioner could not be sure of "The expertise of * * * his advisors", a factor relevant to profit motive under sec. 1.183-2(b)(2), Income Tax Regs.↩
9. Reference to the projection on p. 17 as involving a five-year period is based on including the first two years during the production of the progeny and their maturing to the point when they might potentially be productive of any funds, profitable or otherwise. ↩
10. Even the projection provided to petitioner overstated by $ 1,190.20 the yearly lease payments that OCT Genetics estimated he would receive. The LBI projection shows net lease income of $ 6,820 for two cows, while the materials supplied by OCT Genetics estimate that the investor will receive only $ 2,814.90 in net lease income per cow or $ 5,629.80 for two cows. See supra↩ at pp. 12, 17. 11. See sec. 1.183-2(b)(4), Income Tax Regs.↩
12. If petitioner had studied the projection reproduced at p. 17 he might also have noticed that the after tax profit anticipated therein was substantially inflated, as we have indicated by our footnotes [1], [2], and [3] to the projection. ↩
13. 4The projection on p. 17 shows "Income (Loss) Before Taxes" in the amount of $ 9,385 and "Total Income and Savings After Taxes" in the amount of $ 29,329. The portion of the latter figure attributable to tax benefits, according to the projection, should be $ 19,944 -- the total income after taxes ($ 29,329) reduced by the income before taxes ($ 9,385). The total cash invested in the program is the initial $ 7,750 (for one unit involving the lease of two cows) plus yearly expenses for interest, insurance, maintenance, and fees. Over the years, these expenses are projected to be $ 10,575 ($ 2,790 interest, plus $ 3,710 insurance, plus $ 4,015 maintenance, and $ 60 fees). In addition, an expense of $ 930 a year for "Lease Sale Cost" is estimated in each of the three years that leases with OCT Genetics are expected, for a total of $ 2,790 in such costs. The total out of pocket expenses estimated thus equals $ 21,115. Based on the representations made in the projection an investor could anticipate that of his $ 21,115 cash investment, $ 19,944 or 94.45 percent would be recovered purely through the tax benefits projected. ↩
14. Moreover, petitioner's pattern of activity after he received inconsistent information also indicates that he carried on the activity in something less than "a businesslike manner" during the period (over one year) that he neglected to take any action. See sec. 1.183-2(b)(1), Income Tax Regs.↩
15. The Government has not requested increased additions under either sec. 1504(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2743 or sec. 8002(a) of the Omnibus Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951. ↩
16. However, LBI's brochure promoting the program, a portion of which is reproduced herein, rather clearly refers to the investment as a tax shelter. See supra,↩ p. 14. 17. Clearly, petitioner's reporting of the transaction does not constitute adequate disclosure of the "relevant facts affecting the item's tax treatment". Sec. 6661(b)(2)(B)(ii); Schirmer v. Commissioner,88 T.C. 277, 282-283↩ (1987). 18. Pub. L. 97-248, 96 Stat. 324. ↩